Filed 8/14/26  Leonard, Dicker & Schreiber v. Azad CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LEONARD, DICKER & SCHREIBER LLP, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JACK AZAD, <br><br> Defendant and Appellant. | B344387 <br><br> (Los Angeles County Super. Ct. No. 20STCV14465) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephanie Bowick, Judge.  Affirmed.

The Fox Firm and Melissa J. Fox; Law Offices of Elliott N. Tiomkin and Elliott N. Tiomkin for Defendant and Appellant.

Leonard, Dicker & Schreiber and Richard C. Leonard for Plaintiff and Respondent.

_____

Defendant and appellant Jack Azad appeals from a judgment entered in favor of plaintiff and respondent law firm Leonard, Dicker & Schreiber LLP (LDS), in this action for payment of attorney fees incurred during representation of Azad in an underlying action for breach of a real estate purchase agreement. On appeal, Azad contends: (1) the trial court's instruction in response to a question by the jury was incomplete and misleading; and (2) the evidence established Azad's affirmative defenses of professional negligence and offset as a matter of law. Specifically, Azad asserts LDS knew or should have known by September 2016 that there was no proof of written verification of funds as required by the purchase agreement, and therefore, LDS breached a duty of care to tell Azad that there was virtually no chance of winning his breach of contract action against the seller.

We conclude Azad invited the purported instructional error by submitting the instructions at issue, waived any challenge to the court's response by failing to object or propose additional language, and in any event, the trial court's response was accurate. In addition, we find substantial evidence supports the jury's finding that LDS did not breach the standard of care. Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Purchase Agreement

The seller, Peter Bennett, owned a residential property in Beverly Hills that he had transferred to his trust. On

2

January 11, 2015, the City of Beverly Hills issued a notice of substandard building, order to vacate, and order to abate substandard building, which listed several substandard conditions, including lack of utility services, water damage, rodent infestation, and hazardous, unsanitary premises due to hoarding conditions, dog excrement, and rat droppings. The order to vacate stated that it was a misdemeanor to enter or occupy the structure in violation of the notice. To repair or remove the structure, a person must obtain approval from the City and wear protective closing. The City ordered the owner to abate various substandard conditions within a specified number of days. On February 7, 2015, Bennett listed the property for sale for $3.75 million with Monty Abramov, a licensed real estate agent with Rodeo Realty, Inc.

Azad saw the for-sale sign when he drove by the property. He did some research, called a friend who works in real estate, and decided to make an offer of $3.8 million.

On February 9, 2015, Abramov and Rodeo Realty, acting as a dual agent for buyer and seller, prepared a purchase agreement in which Azad agreed to purchase the property for $3.8 million. The purchase agreement stated that escrow was to close ten days after acceptance. A box was checked stating it was an all cash offer, no loan was needed to purchase the property, and furthermore, "Written verification of sufficient funds to close this transaction IS ATTACHED to this offer or [unchecked box] Buyer shall, within 3 (or _____) Days After Acceptance, Deliver to Seller such verification."

A note was added under "other terms" that the "[p]roperty is a tear down, SOLD AS IS." Another paragraph of the agreement stated the property was sold "AS-IS," subject to Azad's

3

investigation rights. The purchase agreement provided Azad a period of 17 days to conduct any inspections, investigations, surveys, and other studies. The seller agreed to make the property available for all of buyer's investigations. A handwritten addendum to the agreement stated, "Seller needs 3-4 weeks after City of Beverly Hills approves the seller to enter the property to remove their belongings. After removal of items seller will deliver keys to buyer."

Paragraph 14.C. (2) provided the seller with the right to cancel the agreement as follows in pertinent part: "Seller, after first delivering to Buyer a [California real estate form Notice of Buyer to Perform], may cancel this Agreement if, by the time specified in this Agreement, Buyer does not take the following action(s): (i) Deposit funds as required . . . (iv) Deliver verification, or a satisfactory verification if Seller reasonably disproves of the verification already provided, as required by [the paragraph requiring written verification of sufficient funds]."

Paragraph 14.D. provided that a notice to buyer to perform or notice to seller to perform must give the other party at least two days after delivery, or until the time specified in the applicable paragraph, whichever occurred later, to take the applicable action.

On February 11, 2015, Azad and Bennett executed the purchase agreement. Bennett's signature and initials were handwritten, including a signature on the addendum. Azad's signature and initials throughout the agreement were digital, and a handwritten space on the addendum for his signature was left blank. Azad deposited $114,000 into escrow.

On February 13, 2015, Bennett's two sons succeeded him as co-trustees of his trust (hereinafter collectively the seller). The

4

seller did not send Azad a notice to buyer to perform concerning the written verification of sufficient funds. On February 26, 2015, the seller served a demand to close escrow. Azad sent a request for repair proposing a price reduction and an extended 45-day escrow, which the seller rejected. On March 5, 2015, the seller sent a cancellation of contract to Azad.

## B. Breach of Contract Litigation and Representation by LDS

On March 9, 2015, the law firm Grimm & Scholnick filed the underlying breach of contract action on Azad's behalf against the seller. Azad alleged the purchase agreement provided 17 days to perform investigations of the condition of the property and obtain a written appraisal. The seller's agent did not deliver the order to vacate to Azad until February 12, 2015, and had not previously informed Azad that he would not be able to conduct investigations of the property condition. Despite requests for access, Azad had not been able to conduct his investigations of the property through no fault of his own.

The matter was stayed to pursue arbitration (the Bennett Arbitration). The seller also filed a cross-complaint for breach of contract, reformation of the purchase agreement to remove any right of inspection for the buyer, and fraud based on Azad's representation that no loan was needed to purchase the property. Azad substituted attorney Elliott Tiomkin in place of the Grimm firm.

In May 2016, Azad entered into a retainer agreement with LDS, agreeing to pay hourly rates and costs. LDS associated in as cocounsel with Tiomkin in the Bennett Arbitration.

5

On June 13, 2016, the seller's attorney sent a settlement offer to LDS attorney Steven Schuman proposing a mutual release of claims, Azad's withdrawal of a *lis pendens* on the property, release of Azad's escrow deposit of $114,000 back to him, and each party to pay their own attorney fees. The seller asserted Azad's claim that he was not allowed to investigate the property was undercut by facts that he knew there was a notice of abatement issued for the property, the purchase agreement did not contemplate a right to investigate the property (because of the notice of abatement), Azad did not formally request permission from the City to investigate the property, Azad did not request a professional inspection of the property, and Azad did in fact personally investigate the property, not to mention that Azad breached the agreement by failing to deliver written verification of sufficient funds.

On June 15, 2016, LDS attorney Steven Schuman wrote an email to Azad and Tiomkin to convey the settlement offer. Schuman stated, "This case could go either way, as we've discussed all along. Bennett clearly has the larger downside if he loses, however. Your exposure is the deposit plus their fees (and your own, of course)."

On July 8, 2016, following a telephone conversation, Schuman wrote to Azad and Tiomkin that he wanted to amend one of Azad's interrogatory responses to explain how Azad was, and still is, able to provide funds to close escrow. The amended response would state, in pertinent part: "The total purchase price was $3.8 [million]. I planned to put down a total of $2.3 [million], of which $XX was mine and $YY belonged to my cousin _____. $114k of that money was, and remains, in escrow. The balance of the down payment was in the following bank accounts

6

as of February 2015: _____.  [¶]  The balance of approximately $1.5 [million] was to come from a hard money loan from _____.  The loan was approved, and ready to close on five days' notice."  Schuman noted that Azad's cousin and the lender would be witnesses in the case.  He added, "As I've said all along, it is crucial to show that you were ready, willing and able to pay the full purchase price - - both in February 2015, and now.  Otherwise, we have almost no hope of winning.  It is possible to delay providing the information, or to be coy and provide as little as possible, but I recommend against that.  Showing that you could pay the money makes your case look stronger . . . .  It might lead to settlement, among other things."

On September 12, 2016, LDS filed an action on Azad's behalf against Abramov, who had acted as a dual agent in the property transaction, and his employer Rodeo Realty (the Rodeo Action).  The parties in the Rodeo Action ultimately settled with Azad.

On September 19, 2016, Schuman wrote an email to Azad and Tiomkin stating that they should discuss their settlement strategy.  He added, "There is substantial risk for both sides in [the Bennett Arbitration].  It could go either way at trial.  I'm more than happy to keep pushing down the road to trial, and to try the case, but it is important that we keep our eye out for settlement possibilities[] too."

On December 2, 2016, Azad obtained a loan commitment letter from Hooshang "Sean" Namvar of Equimax Mortgage & Loan to show that he was ready and willing to make the loan required.

7

## C.    Arbitration and Final Award

Azad testified in the arbitration proceedings that he faxed proof of funds to Abramov, but it was not received, so Abramov said to bring it to their meeting.  At the meeting, Azad provided bank statements to Abramov showing that he had $2.3 million in funds available in bank accounts in February 2015.  Abramov put the documents in a folder, but never said Azad's documents were not sufficient.  Azad planned to get a loan from Namvar for the balance of the purchase price.  Azad testified at the arbitration that Namvar was very interested in making the loan for the property.  Azad did not pursue the loan from Namvar because the following day, the inability to inspect the property came up.

During arbitration, Namvar testified that he did not meet with Azad about the property until a year after the purchase agreement had been executed.  Azad did not request a loan commitment letter in 2015.  Namvar generally requires 10 to 14 days to fund a loan.  However, he would have given Azad a commitment letter in 2015 if Azad had applied.

There was testimony in the arbitration proceeding that it was Abramov who checked the box for an all cash offer, including the representation about written verification of funds, after Azad had signed the purchase agreement.

On July 11, 2017, the arbitrator issued the final arbitration award in the Bennett Arbitration.  The arbitrator had "serious doubts" about Abramov's credibility as to some of his testimony, but accepted Abramov's testimony that in two pre-offer telephone conversations with Azad and/or Azad's friend, Abramov discussed the order to vacate the property, which had been factored into the

8

asking price for the property. The arbitrator noted that considering the requirements for access and remediation in the City's order to vacate, if a thorough interior inspection was important to Azad, he needed to have immediately requested an extension of escrow to coordinate access issues with the City. Azad had testified he was shocked to review the order to vacate because Abramov never told him that the property could not be inspected. He also testified that it would be "outrageous" to require him to address the remediation issues in the order to vacate in order to allow access to the interior prior to escrow closing. The arbitrator concluded Azad's claim that it was the seller's obligation to remediate issues raised by the City to allow access was disingenuous in light of the "As-Is" nature of the sale and time being of the essence. Azad was not entitled to extend escrow until the issues in the order to vacate were addressed by the seller without a mutual agreement. Azad's remedy was to proceed with closing or cancel the transaction.

The arbitrator found Azad failed to prove that the seller provided no inspection opportunity. The issues were whether inspection was requested, whether access was provided, and whether Azad properly communicated displeasure with the inspection opportunity provided. If Azad was unsatisfied with his access to inspect the property or the scope of the inspection that he conducted around the perimeter of the property on February 20, 2015, then under the terms of the purchase agreement, he was required to serve a notice to perform on the seller, which he did not do. His only recourse afterward was to cancel the agreement.

With respect to Azad's breach of contract claim, the arbitrator found Azad failed to perform his own obligations under

9

the purchase agreement. Azad did not have $3.8 million to timely close escrow. In Namvar's testimony, he expressed only a general interest in potentially loaning funds against the property, which was insufficient to prove Azad's ability to purchase the property. The loan commitment from Namvar was two years too late. Inability to pay the purchase price was a material breach of the contract at the outset.

Azad also had not shown the seller breached the contract. He viewed the perimeter of the property on February 20, 2015, and a real estate expert testified that terms like "inspection" and "investigation" do not have set definitions. The arbitrator concluded Azad failed to request any specific type of inspection until escrow was nearly closed. In light of information that the arbitrator found had been provided, Azad was aware of the difficulties concerning inspection. If the inspection opportunity he received was inadequate, he could have served a demand to perform, but he did not. He never took steps to arrange a professional inspection. He simply served a request for repair, after the closing date of the transaction. The seller did not commit any material breach, so Azad could not prove his breach of contract causes of action.

On the seller's cross-claim for breach of contract, the trial court found Azad breached the contract by failing to deposit $3.8 million into escrow by February 23, 2015. The arbitrator also concluded Azad falsely represented that proof of funds was included with the purchase agreement. The seller provided testimony that the transaction would have been completed if Azad had deposited $3.8 million in escrow. Based on finding in favor of the seller on the seller's breach of contract cross-claim, the arbitrator awarded $114,000 in liquidated damages against

10

Azad. As a result of these findings, it was unnecessary to address the seller's cross-claim for reformation.

On the seller's fraud cross-claim, the arbitrator concluded Azad's statement that he did not need a loan to purchase the property was a misrepresentation, because when he signed the agreement, he did not possess $3.8 million and needed a loan. The arbitrator found, however, that the seller did not meet its burden of proof to show that Azad knew, or recklessly misrepresented in disregard of the truth, that he would have been able to perform in the escrow period. Therefore, the arbitrator found against the seller on the fraud cross-claim and denied the seller's request for punitive damages.

The arbitrator concluded the seller was the prevailing party entitled to attorney fees and costs.

## D.    The Instant Collections Action

Azad paid a portion of the bills received from LDS, but not the full amount. On January 29, 2021, LDS filed an action against Azad for breach of contract, open book account, and quantum meruit, seeking payment in excess of $277,156 for unpaid attorney fees and costs, plus interest. Azad filed an answer alleging affirmative defenses based on professional negligence and an offset to any award of damages.

A jury trial began on July 31, 2024. Azad presented testimony from attorney fees expert John O'Connor. O'Connor opined that by July 2016, Schuman knew or should have known that there was no written verification of funds as required by the purchase agreement. By September 2016, after interviewing Azad and speaking with Namvar about the requirements for a

11

loan commitment, Schuman owed a duty of due care to tell Azad that there was virtually no chance of winning the arbitration. There had been a material breach of a term of the purchase agreement, so the seller had no obligation to pass title to Azad. A reasonable attorney in similar circumstances should have said there was a serious problem with the case and there was essentially no chance or the slimmest of chances to win the case.

O'Connor admitted the purchase agreement was a little ambiguous about the timing to provide a written verification of funds. The purchase agreement said written verification of funds was attached, but then there was a box that could be checked off, which was not checked off, that said "or within three days or blank days after that."

Any finding by the arbitrator that Azad lacked credibility did not affect O'Connor's opinion, because the lack of written verification of funds was a material breach. In forming his opinion, O'Connor did not review the reporter's transcript of the arbitration. He also did not review the depositions that were taken in the current matter.

O'Connor agreed that the seller was equally bound by the purchase agreement. He acknowledged a paragraph of the purchase agreement required the seller to deliver a notice to perform to Azad before the seller could cancel the agreement for failing to take certain actions, including failing to provide proof of funds. O'Connor did not know if there was testimony during the arbitration about whether the seller had delivered a notice to perform to Azad because he did not read the arbitration testimony.

O'Connor admitted that the agreement generally provided that the seller had a right to cancel the agreement in certain

12

situations only if there had been a notice to perform served on the buyer. But O'Connor stated the seller did not have to comply with the contract by sending a notice to perform once Azad materially breached the contract by failing to provide proof of funds.

LDS's attorney pointed out that the form notice to buyer to perform states the seller is giving notice to the buyer to remove the specified contingency and take the specified contractual action, including "all cash verification." O'Connor agreed the requirement to provide proof of funds could be specified in a notice to buyer to perform. LDS's attorney pointed out on the form, "In fact, if you look under contractual action, paragraph N, it says, 'all cash verification,' paragraph 3-C?" O'Connor responded, "Okay. There you are. I agree." O'Connor acknowledged that there was no notice provided to Azad about proof of funds, only a notice to provide the funds required to close the transaction.

O'Connor understood that Azad claimed to have provided documents about proof of funds to Abramov. O'Connor also considered it to be a grey area whether proof of a loan commitment was the same as proof of funds.

In O'Connor's view, it was irrelevant that Azad was not aware the purchase agreement required proof of funds to be attached and only learned about the requirement later, or that Azad wanted to inspect the property before paying $10,000 for the loan commitment letter from Namvar. The issue was whether he should have been advised in his subsequent litigation that he had no chance of winning because he did not comply with the contract term by attaching a written commitment letter as proof of funds.

13

O'Connor was not aware of any of the conversations between Schuman and Azad about whether proof of funds had been attached to the contract. O'Connor was not aware whether the firm that filed the original lawsuit against the seller believed the case was unwinnable because there was no proof of funds. He never discussed with attorney Tiomkin, who was the sole attorney representing Azad for nine months, whether Tiomkin advised Azad that the case was unwinnable.

O'Connor could not remember whether he read the seller's cross-complaint. O'Connor admitted that even if Azad dismissed his action, the seller would have had to pursue the cross-claims to be entitled to claim Azad's deposit from the escrow.

O'Connor additionally testified that the arbitrator's findings in the Bennett Arbitration made the Rodeo Action not worth pursuing and LDS should have advised Azad to get out of that action as well.

O'Connor believed LDS's hourly rate was market rate, and he did not look for any errors in LDS billing statements. His testimony was simply that there should not have been any charges after September 2016.

Attorney Kevin Dicker, who performed work on Azad's matters for LDS, testified that the attorneys involved thought the Rodeo Action "was a strong case. Especially in light of what had happened at the arbitration. . . . The arbitrator made comments that Mr. Abramov was the real, you know, was a real bad actor here. That he had conflicts of interest. That he wasn't informing both sides of what was really going on. . . . [¶] . . . [I]t was better than 50 percent. Maybe 60, 70 percent, maybe 75 percent of winning that second action against Abramov and Rodeo."

14

## E.     Instructions, Jury Question, and Judgment

The attorneys for both parties confirmed the final set of jury instructions were acceptable, subject to specific objections that had been made during discussions.

The parties submitted a joint list of CACI jury instructions which included CACI No. 219.  The court instructed the jury on expert witness testimony in the language of CACI No. 219 as follows:  "During the trial you heard testimony from expert witnesses.  The law allows an expert to state opinions about matters in the expert's field of expertise even if the expert has not witnessed any of the events involved in the trial.  You do not have to accept an expert's opinion.  As with any other witness, it is up to you to decide whether you believe the expert's testimony and choose to use it as a basis for your decision.  You may believe all, part, or none of an expert's testimony.  In deciding whether to believe an expert's testimony, you should consider:  [¶]  (a) The expert's training and experience; [¶] (b) The facts the expert relied on; and [¶] (c) The reasons for the expert's opinion."

In addition, Azad requested CACI No. 600 on the standard of care.  The trial court instructed the jury on the standard of care in the language of CACI No. 600 as follows:  "A lawyer is negligent if he or she fails to use the skill and care that a reasonably careful lawyer would have used in similar circumstances.  This level of skill, knowledge, and care is sometimes referred to as 'the standard of care.'  [¶]  You must determine the level of skill and care that a reasonably careful lawyer would use in similar circumstances based only on the testimony of the expert witnesses who have testified in this case."

15

During deliberations, the jury sent out the following written question: "With respect to [Azad's] Special Jury Instruction 5, [CACI No.] 600 Standard of Care, paragraph two, in reference to 'testimony of the expert witnesses' are we to assume that this refers only to John O'Connor or would we consider the other witnesses within this clause."

Azad's attorney argued that witnesses other than O'Connor had not been qualified as experts. The court responded, "Okay, so you would suggest that I would say, yes, you are correct. John O'Connor is the only expert witness in this case?" Azad's attorney answered yes. LDS's attorney suggested the language of the instruction could refer to the other attorneys who testified.

The trial court asked which instruction discussed expert witness testimony. Azad's attorney stated, "The general expert instruction is [CACI No.] 219, Your Honor. [T]he use notes of [CACI No.] 219 indicate that . . . if there's only one witness that's testifying, then actually that instruction shouldn't even be given. But we didn't object to [CACI No.] 219 because, you know, we had an expert testify. [CACI No.] 219 is the general expert." The trial court concluded CACI No. 219 was not relevant to the jury's question.

LDS's attorney argued strenuously that it was misleading to say CACI No. 600 applied only to O'Connor's testimony because the jury did not need to accept the testimony of the expert and the jury should be told to consider any other instruction that might be applicable. The trial court responded, "I have to answer their question, Mr. Leonard. I don't go through all the instructions and answer what else might apply to an expert witness' testimony. That's not what their question is." The trial court overruled LDS's objection to the court's proposed

16

response.  LDS suggested that the testimony by the attorneys at trial could be considered expert testimony, but the trial court stated that would be misleading because the attorneys had not been designated as experts.

The trial court added a statement that instruction CACI No. 600 applied to O'Connor only, then asked Azad's attorney if there was any objection to the court's proposed response.  Attorney Tiomkin responded, "No, Your Honor."

After further argument by LDS, the trial court stated the answer given to the jury would not refer to CACI No. 219.  The court noted that Tiomkin agreed the answer did not need to refer to CACI No. 219.  Asked if he wanted to say anything else, Tiomkin said no.

The trial court responded to the jury in writing as follows: "Yes.  You are correct.  John O'Connor is the only expert witness in this case and [CACI No.] 600 Standard of Care applies only to John O'Connor's testimony."

The following day, the jury found in favor of LDS in the amount of $277,156.54.  The jury found Azad did not suffer any damages as a result of negligence by LDS.  Judgment was entered on October 30, 2024, in favor of LDS.  With the addition of pre-judgment interests and costs, the total judgment awarded was $503,264.17.

Azad filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial.  Azad argued that the jury was given conflicting instructions, in that CACI No. 219 should not have been given and was inconsistent with CACI No. 600.  In addition, he argued that the evidence did not support the verdict because the damages were excessive based on

17

O'Connor's uncontradicted testimony.  The trial court denied the motion.  Azad filed a timely notice of appeal from the judgment.

## DISCUSSION

## A.    Jury Instructions Given at Appellant's Request

To the extent that Azad contends the trial court erred by instructing the jury in the language of CACI No. 219, his claim is barred by the doctrine of invited error.

"A party is entitled to have the jury instructed on each viable legal theory supported by substantial evidence if the party requests a proper instruction.  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.)"  (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1333.)

"The doctrine of invited error bars an appellant from attacking a verdict that resulted from a jury instruction given at the appellant's request.  [Citations.]  [¶]  The invited error doctrine applies 'with particular force in the area of jury instructions.  Whereas in criminal cases a court has strong sua sponte duties to instruct the jury on a wide variety of subjects, a court in a civil case has no parallel responsibilities.  A civil litigant must propose complete instructions in accordance with his or her theory of the litigation and a trial court is not "obligated to seek out theories [a party] might have advanced, or to articulate for him that which he has left unspoken."  [Citations.]'  [Citation.]"  (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1653.)

Azad is estopped from claiming on appeal that the court erred in giving CACI No. 219 because Azad requested the

18

instruction without modification. Through the joint stipulated instructions, Azad requested the trial court instruct the jury in the language of CACI No. 219, and separately, Azad requested that the trial court provide CACI No. 600. The appellant's tactical decision to request particular jury instructions is a classic example of invited error.

## B. Response to Jury Question

Azad contends the jury's question about CACI No. 600 created an independent duty to provide complete legal guidance, requiring the trial court to explain a limitation on the use of CACI No. 219. We conclude Azad waived his objection to the trial court's answer by failing to object, and in any event, the trial court's answer to the jury's question was correct.

A party waives any claim of error with respect to the trial court's response to a jury question when counsel participates in the formulation and affirmatively approves of the response that is ultimately given. (*People v. Jennings* (2010) 50 Cal.4th 616, 683.) In response to the jury's question about the application of CACI No. 600, the trial court expressly asked Azad's attorney several times whether Azad was in agreement with the court's proposed response to the jury. Azad's attorney agreed with the court's answer each time and raised no objection. He did not propose that any different or additional language be provided to the jury. His contention on appeal that the response was misleading or incomplete has been waived for failing to object or request any additional language in the court below.

In addition, we note that the jury asked which witnesses CACI No. 600 applied to. The trial court's response that

19

CACI No. 600 applied to O'Connor's testimony was correct. The jury did not ask about CACI No. 219, and no reference to any other jury instruction was necessary to answer the jury's question. No error has been shown.

## C.    Substantial Evidence Supporting Verdict

Azad does not challenge the finding that LDS established the elements of their claims. Instead, Azad contends there was no substantial evidence to support the jury's finding of no professional negligence, because undisputed evidence showed LDS breached the standard of care. Specifically, he contends that once LDS knew or should have known that there was no proof of written verification of funds as required by paragraph 3C of the purchase agreement, which was no later than September 2016, LDS owed a duty of care to tell Azad that there was virtually no chance of winning his breach of contract action against the seller, and by failing to advise Azad of this likelihood of failure, LDS breached the standard of care. We conclude substantial evidence supports the finding that there was no professional negligence.

O'Connor testified that the standard of care required LDS to advise Azad that his case was not winnable once LDS knew or should have known that there was no written verification of funds as required by the purchase agreement, because failing to provide written verification of funds was a material breach of the agreement from the outset. O'Connor acknowledged, however, that the purchase agreement required the seller to send a notice to buyer to perform, which expressly included the written verification of funds, and allowed the buyer two days to take the

20

action specified. O'Connor did not know if there was testimony at the arbitration about whether the seller delivered a notice to buyer to perform with respect to the written verification of funds because he had not read the arbitration transcript.

The evidence showed LDS did not breach of the standard of care. Azad testified that he was unaware of the requirement to provide proof of funds until later. He provided proof of funds to Abramov, and the seller never said the documents were inadequate. The seller never sent a notice to buyer to perform by providing additional proof of funds. LDS showed that if there was an issue with the proof of funds, the contract clearly required the seller to provide a notice to buyer to perform and gave the buyer a grace period to complete the action before the seller was entitled to cancel the contract. O'Connor was not aware of the conversations between LDS and Azad about proof of funds, and he did not read the testimony in the arbitration proceedings.

It was also clear from the arbitration award that unless the seller sent a notice to buyer to perform, a failure to provide proof of funds was not a material breach of the agreement such that Azad had no chance of winning on his claims. In analogous circumstances, the arbitrator found that because Azad did not send a notice to seller to perform, the seller's purported failure to provide an opportunity to inspect the property was not a material breach of the agreement.

We note that LDS met the standard described by O'Connor because LDS advised Azad that if he could not prove he was ready, willing, and able to pay the full purchase price in February 2015, he had almost no hope of winning his case. Despite LDS's assessment, Azad chose to continue his action against the seller. The proof of funds was irrelevant to the arbitration proceedings

21

and the arbitrator's rulings.  Instead, the arbitrator found Azad did not in fact have $3.8 million to timely close escrow in February 2015, which was a breach of the purchase agreement, just as LDS warned Azad was the critical issue.  Substantial evidence supports the finding that LDS was not negligent and no offset was warranted based on negligence.

Because the motion for judgment notwithstanding the verdict and the motion for new trial were brought on the same grounds already above, it is not necessary to address those rulings further.

## DISPOSITION

The judgment is affirmed.  Respondent Leonard, Dicker & Schreiber LLP is awarded its costs on appeal.

NOT TO BE PUBLISHED.

MOOR, Acting P. J.

I CONCUR:

KUMAR, J.*

---

*	Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22

Leonard, Dicker & Schreiber v. Jack Azad
B344387


BAKER, J., Concurring


I agree with the majority's conclusion that defendant and appellant waived the ability to challenge the trial court's response to the jury question by repeatedly agreeing with the trial court's proposed answer to that question before the answer was given. I likewise agree the jury's verdict is supported by substantial evidence. The majority also rejects, insofar as it is raised as a ground for reversal by defendant and appellant, the trial court's instruction of the jury with CACI No. 219. While I disagree with the majority's rationale on this point—which unnecessarily and incorrectly relies on the doctrine of invited error—I still agree that the CACI No. 219 instruction provides no basis for reversal.

Invited error, as distinguished from forfeiture, applies when a party makes a deliberate or tactical choice to request a jury instruction. (See, e.g., *People v. Weaver* (2001) 26 Cal.4th 876, 970 ["Although the instruction was erroneous . . . , the record reveals counsel made a deliberate choice to request the instruction; hence, the error was invited"]; *People v. Lucero* (2000) 23 Cal.4th 692, 723 ["The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction"]; *People v. Moon* (2005) 37 Cal.4th 1, 28 ["The invited error doctrine will not preclude

appellate review if the record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction"]; see also *People v. Townsel* (2016) 63 Cal.4th 25, 59 ["The Attorney General contends defendant invited any error by agreeing that the instruction should be given as read, and thus forfeited his appellate claim. But the invited error doctrine does not apply here, in the absence of any clear tactical purpose on defense counsel's part . . ."]; but see *Jentick v. Pacific Gas & Electric Co.* (1941) 18 Cal.2d 117, 121.) The majority, however, greatly expands the reach of the invited error doctrine by holding that the mere submission of jointly proposed pattern jury instructions—no matter whether the record permits an inference that defendant and appellant deliberately or tactically requested CACI No. 219 (see, e.g., *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49)—is alone enough to justify resort to invited error.

If this were an appeal in a criminal case, where invocation of invited error can foreclose an otherwise reviewable claim of instructional error (given Penal Code section 1259), the majority's (mis)application of the invited error doctrine would present a strong case for clarification or correction by our Supreme Court. But this is a civil case, and in a civil case, instructional errors can be forfeited on appeal by the absence of a trial court objection regardless of whether or not the error is legally "invited." (See, e.g., *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130 ["[B]y requesting the instructions the court gave and not requesting any additional instructions, plaintiff has forfeited the right to argue on appeal that the court misinstructed the jury"]; *Martinez v. Rite Aid Corp.* (2021) 63 Cal.App.5th 958, 970 & fn. 3.) And that is why I concur in the result reached by the majority: defendant and appellant forfeited any claim of error in

2

giving CACI No. 219 because he did not object to the instruction (and, indeed, requested the court give it—the reason why doesn't matter).


BAKER, J.